IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CENTRAL LAUNDRY, LLC, *et al.*,  )
                                           )
       Plaintiffs,  )
                                             )
       v.  )       Civil Action No. 1:20-cv-1273 (RDA/TCB)
                                             )
ILLINOIS UNION INSURANCE  )
COMPANY,  )
                                             )
       Defendant.  )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the Motion for Partial Summary Judgment brought by Plaintiffs, Professional Hospitality Resources, Inc., Central Laundry, LLC, Heritage Investments, LLC, 34th Street Garage, LLC, Oceanfront Investments, LLC, Cavalier Associates, LLC, Norfolk Hotel Associates, LLC, and Atlantic Coast Development, LLC (collectively "Plaintiffs" or "Insureds"), and on the Motion for Summary Judgment brought by Defendant Illinois Union Insurance Company ("Defendant" or "Insurer") in this insurance coverage case. Dkt. Nos. 46; 48. The Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition.

Considering Plaintiffs' Motion for Partial Summary Judgment (Dkt. 46), Plaintiffs' Memorandum in Support (Dkt. 47), Defendant's Brief in Opposition (Dkt. 57), Plaintiffs' Reply (Dkt. 59), as well as Defendant's Motion for Summary Judgment (Dkt. 48), Defendant's Memorandum in Support (Dkt. 49), Plaintiffs' Brief in Opposition (Dkt. 54), and Defendant's Reply (Dkt. 60), it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED and it is further ORDERED that Plaintiffs' Motion for Partial Summary Judgment is

DENIED.  For the reasons that follow, judgment must be entered against Plaintiffs' claims because Plaintiffs have failed to establish a triable issue of material fact.

## I.   BACKGROUND

### A.   Factual Background

Although the parties dispute certain facts, the following facts are uncontested except where noted.  *See* Dkt. 47 at 3-9; Dkt. 49 at 2-14.

Plaintiffs are the owners and operators of several hospitality, hotel, and restaurant businesses located in Norfolk and Virginia Beach, each of which is owned by Gold Key/PHR. Dkt. 1-2 at 2-4 ¶¶ 1-8, 14.  Plaintiffs allege the novel coronavirus, SARS-CoV-2, known to cause the COVID-19 infectious disease ("COVID-19"), has and continues to suspend and threaten Plaintiffs' operations.  *Id.* at 5 ¶15.  COVID-19 is a severe acute respiratory syndrome that may cause respiratory illness and inflammation.  Dkt. 47 at 4.  The virus spreads using people as vectors and is thought to be primarily transmitted via respiratory droplets but also via contaminated hands, including those of asymptomatic carriers of the disease, and contaminated surfaces.  *Id.* at 5.  The Governor of Virginia labeled COVID-19 as a "communicable disease of public health threat" as defined in § 44-146.16 of the Code of Virginia and a "disaster" as defined in § 44-146.16 of the Code of Virginia.  *Id.* at 210-11.  Furthermore, the Governor determined that a "substantial number" of individuals with the disease are asymptomatic.  *Id.* at 254.

Plaintiffs sought insurance coverage from Defendant for income losses and extra costs related to the partial suspension of their operations as well as the costs expended to remediate the presence and future threat of COVID-19.  They sought coverage under Premises Pollution Liability Portfolio Insurance Policy number PPI G27840620 001 ("Policy"), which Defendant issued to Plaintiffs covering the period from April 18, 2016 to April 18, 2021.  *Id.* at 29.  Plaintiffs had over

100 employees test positive for COVID-19 while working across seven locations in Virginia—each of which is considered a "covered location" under the Policy.  Dkt. 47 at 7; Dkt. 57 at 5.  All parties agree that Plaintiffs' claim falls within the Policy period.

In a letter to Defendant from Plaintiffs, dated March 20, 2020, Plaintiffs notified Defendant of a claim for "business interruption."  Dkt. 1-2 at 322-23.  In that letter, Plaintiffs attributed the "business interruption" to a March 17, 2020 notice from the Governor of Virginia declaring the spread of COVID-19 virus a public health emergency, which required Plaintiffs to "partially suspend business operations." *Id.* at 323.  On April 9, 2020, Defendant provided a response letter to Plaintiffs denying coverage under the Policy because the claim "d[id] not involve a 'pollution condition or 'an indoor environmental condition,'" and as a result, "coverage for 'business interruption' is not triggered."  Dkt. 47-9 at 4.  A letter to Defendant from Plaintiffs, dated April 17, 2020, included additional "covered locations" for which Plaintiffs sought compensation for "loss" under the Policy.  *Id.* at 332.

The definitions in the Policy are extensive and interrelated.  For this reason, this Court summarizes the relevant definitions undergirding the arguments presented in the cross-motions for summary judgment.

Plaintiffs generally allege that COVID-19 was a "pollution condition" under the Policy and that they are entitled to compensation under the Policy for losses sustained therefrom at each of their "covered locations" (those locations covered under the terms of the Policy).  "Pollution condition" is defined in relevant part as:

> The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including soil, silt, sedimentation, smoke, soot, vapors, fumes, acids, alkalis, chemicals, electromagnetic fields (EMFs), hazardous substances, hazardous materials, waste materials, "low-level radioactive waste", "mixed waste" and medical, red bag,

3

infectious or pathological wastes, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater.

Dkt. 1-2 at 39.

The Policy generally indemnifies Plaintiffs for up to $5,000,000 per "pollution condition" with a $10,000,000 aggregate cap for "all pollution conditions" in excess of a $50,000 self-insured retention payment per "pollution condition." *Id.*; Dkt. 49 at 2-3. A three-day deductible period also applies to each "pollution condition," whereby Defendant is not required to cover liability costs associated with the "pollution condition" for three days following the occurrence of said "pollution condition." Dkt. 1-2 at 29.

There exist three relevant insuring agreements under which Plaintiffs seek compensation from Defendant due to their assertion that COVID-19 qualifies as a "pollution condition": First-Party Remediation Costs Coverage ("Coverage A"); First-Party Emergency Response Coverage ("Coverage B"); and Supplemental Coverage – Loss of Rental Income ("Supplemental Coverage"). Each of the three coverages applies to "Loss" emanating in one way or another from the negative impact of a "pollution condition."

Coverage A requires that the "pollution condition" exist "on, at[,] under or migrating from a 'covered location.'" *Id.* at 32. "Loss" under Coverage A includes "first-party remediation costs" which are defined as "reasonable necessary 'remediation costs' incurred by an 'insured' resulting from the discovery of a 'pollution condition'…." "Remediation costs" are those "expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize 'pollution conditions' … to the extent required by 'environmental law' in the jurisdiction of such 'pollution conditions'…." "Environmental law" is defined as:

any Federal, state, commonwealth, municipal or other local law, statute, ordinance, rule, guidance document, regulation, and all amendments thereto (collectively Laws), including voluntary cleanup or risk-based corrective action guidance, or the direction of an "environmental professional" acting pursuant to the authority

4

provided by any such Laws, along with any governmental, judicial or administrative order or directive governing the liability or responsibilities of the "insured" with respect to a "pollution condition" or "indoor environmental condition".

*Id.* at 36.

Coverage A "Loss" also includes "business interruption loss" which means, as relevant here, "Business income" which the Policy defines as "Net profit or loss . . . that would have been realized had there been no 'business interruption'" *id.* at 35, or "extra expense" which the Policy defines as:

costs incurred by the "insured" due to a "pollution condition" or "indoor environmental condition" that are necessary to avoid or mitigate any "business interruption". Such costs must be incurred to actually minimize the amount of foregone "business income" that would otherwise be covered pursuant to this Policy.

*Id.* at 37.

"Business interruption" in turn is defined as:

the necessary partial or complete suspension of the "insured's" operations at a "covered location" for a period of time, which is directly attributable to a "pollution condition" or "indoor environmental condition" to which Coverage A of this Policy applies. Such period of time shall extend from the date that the operations are necessarily suspended and end when such "pollution condition" or "indoor environmental condition" has been remediated to the point at which the "insured's" normal operations could reasonably be restored.

*Id.* at 35.

Coverage B requires that the "pollution condition" exist "on, at[,] under or migrating from a 'covered location.'" *Id.* at 32. "Loss" under Coverage B includes "emergency response costs," which are defined to include:

first-party remediation costs' incurred within seven (7) days following the discovery of a "pollution condition"… in order to abate or respond to an imminent and substantial threat to human health or the environment arising out of … [a] "pollution condition" … on, at, under or migrating from a "covered location" … provided such "emergency response costs" are reported to the Insurer within

fourteen (14) days of when [the Insured] first became aware of such "pollution condition"….

*Id.* at 35, 37.

Lastly, under the Supplemental Coverage, the Policy provides compensation to the Insured for "the actual 'loss of rental income' . . . resulting from a necessary period of 'suspension' arising out of a 'pollution condition' on, at or under . . .  a 'covered location' . . . ." *Id.*  at 61-62. "Loss of rental income" is defined as "the total, reasonable anticipated rental fees owed to the 'insured' from tenant occupancy due to the 'suspension' of a rented 'covered location'."  *Id.* at 62. "Suspension" occurs when "part of, or all of, a rented 'covered location' is rendered untenantable . . . due to a 'pollution condition' on, at or under . . . such 'covered location', which results in first-party 'remediation costs'."  *Id.*

## B.   Procedural Background

On September 18, 2020, Plaintiffs filed their complaint against Defendant in the Circuit Court for the City of Virginia Beach.  The Complaint requests a declaratory judgment as to amounts owed by Defendant to Plaintiffs under the Policy, seeking $11,408,899 in "business interruption losses" and $129,554 in "extra expense" and asserting a "bad faith" breach of contract claim. Dkt. 1-2 at 24 ¶104.  On October 28, 2020, Defendant properly filed a notice of removal to this Court, which jurisdiction this Court accepted as proper under both 28 U.S.C. § 1332(a) and 28 U.S.C. § 1441(b).  Dkt. 1.

On December 11, 2020, Defendant filed an Answer to Plaintiffs' Complaint and its Affirmative Defense. Dkt. 10.  This Court then issued a scheduling order to begin discovery and the final pretrial conference was set for June 17, 2021.  Dkt. 11.  At the final pre-trial conference, this Court set trial for March 1, 2022.  Dkt. 34.

Cross-motions for summary judgment and attendant briefs were filed by the parties on October 25, 2021.  Dkt. Nos. 46-49.  In their Memorandum in Support of Motion for Partial Summary Judgment, Plaintiffs argue they are entitled to partial summary judgment as to the existence of a legitimate claim of losses directly attributable to a "pollution condition" under the Policy and that the issue of damages is for a trier of fact to make.  Dkt. 47.  On the other hand, in Defendant's Memorandum in Support of Motion for Summary Judgment, Defendant argues they are entitled to summary judgment and that the case should be dismissed on the grounds that there is no genuine dispute as to any material fact related to COVID-19 virus constituting a "pollution condition" under the Policy and even if COVID-19 qualified as a "pollution condition," Plaintiffs have not presented a genuine dispute as to any material fact related to losses claimed under the Policy.  Dkt. 49 at 16-31.  As a follow-on to their core argument, Defendant maintains that there is no cognizable basis, as a matter of law, for a bad faith claim based on Defendant's alleged breach of contract given no liability existed under the Policy in the first instance.  *Id.* at 31-34.

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va. 2014) (quoting Fed. R. Civ. P. 56(a)).

"A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Id.* at 615-16 (quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)).  The moving party bears the "initial burden to show the absence of a material fact."  *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "Once a motion for summary judgment is

properly made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a Court reviews the evidence in the light most favorable to the non-moving party. *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). Here, Plaintiffs and Defendant have each filed cross-motions for summary judgment. Therefore, "we consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007) (internal quotation marks omitted). Moreover, in considering the motion for summary judgment filed by Plaintiffs, the facts and all reasonable inferences are accordingly drawn in Defendant's favor. On the other hand, in considering the motion for summary judgment initiated by Defendant, the facts and all reasonable inferences are accordingly drawn in Plaintiffs' favor. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)). This is a "fundamental principle" that guides a Court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists. *Id.* "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. And a "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d

459, 465 (4th Cir. 2001).  The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).  A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor.  *Anderson*, 477 U.S. at 248.

### III.   ANALYSIS

Given the factual record on summary judgment, it is necessary to determine whether summary judgment is appropriate as to Plaintiffs' and Defendant's claims.  Because the claims made in Defendant's brief in support of summary judgment cover the claim made in Plaintiffs' brief supporting partial summary judgment, this Court will evaluate the cross-motions by examining the assertions made by Defendant in Defendant's brief supporting summary judgment.

### A.   COVID-19 and "Pollution Condition"

Plaintiffs assert that COVID-19 constitutes a "pollution condition" under the Policy while Defendant argues the opposite.  The Court must first review the applicable law of the forum in which the claim arises.  As Plaintiffs rightly outline in their brief, Virginia law applies.  Dkt. 47 at 10.  It is a fundamental principle that a federal court presiding over a case with jurisdiction via the diversity statute, as here, is obliged to apply the substantive law directed by the forum's choice-of-law rules.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Virginia's choice-of-law rules apply the *lex loci contractus* rule whereby the law of the state where the contract was formed governs.  *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423 (1970).  The place of contracting "is determined by the place where the final act necessary to make the contract binding occurs."  *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).  Here, the Policy was executed by an authorized

representative of the lead policyholder, Professional Hospitality Resources, Inc., located in Virginia Beach, Virginia and was therefore issued and delivered in Virginia. Dkt. 1-2 at 29, 31; *see Allied Prop. & Cas. Ins. Co. v. Zenith Aviation, Inc.*, 336 F. Supp. 3d 607, 610 (E.D. Va. 2018). As such, Virginia contract interpretation law applies.

Under Virginia law, contract interpretation is a question of law governed by the ordinary rules of contract interpretation. *Penn Nat'l Mut. Cas. Ins. Co. v. Block Roofing Corp.*, 754 F. Supp. 2d 819, 823 (E.D. Va. 2010); *Bohrer v. Erie Ins. Grp.*, 475 F. Supp. 2d 578, 584 (E.D. Va. 2007). The insured bears the burden of establishing a *prima facie* case that they have a claim under their coverage policy such that the insured must "bring himself within the policy." *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 706 (E.D. Va. 2010) (quoting *Maryland Cas. Co. v. Cole*, 156 Va. 707, 715 (1931)). The burden is onerous only to the degree "it clearly appears from the initial pleading the insurer would not be liable under the policy contract for any judgment based upon the allegations." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005). In the event the insured meets his initial burden, the burden shifts to the insurer to raise its affirmative defenses, including applying any relevant policy exclusions. *TRAVCO Ins. Co.*, 715 F. Supp. 2d at 706.

Courts applying Virginia contract interpretation principles to an insurance policy must first evaluate whether the language of the policy is "clear and unambiguous." *Transcontinental Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 512 (2001); *Schneider v. Continental Cas. Co.*, 989 F.2d 728, 733 (4th Cir. 1993). If so, courts must "give the language its plain and ordinary meaning and enforce the policy as written." *Penn Nat'l Mut. Cas. Ins. Co.*, 754 F. Supp. 2d at 823. On the other hand, if the court determines the language is ambiguous as a matter of law, Virginia law applies rules of construction in favor of a reading that "grants coverage, rather than one which

withholds it." *Gov't Emps. Ins. Co. v. Moore*, 266 Va. 155, 165 (2003).  But establishing ambiguity is a high standard.  A court will not find ambiguity "merely because the parties disagree as to the meaning of the terms used."  *TM Delmarva Power, LLC v. NCP of Va., LLC*, 263 Va. 116, 119 (2002).  Courts must not "strain to find ambiguities . . . or examine certain specific words or provisions in a vacuum, apart from the policy as a whole."  *Res. Bankshares Corp.*, 407 F.3d at 636 (internal citation omitted).

Moreover, courts applying Virginia contract interpretation law read such contracts "as a whole" in order to squarely identify the intent of the parties at the time of contracting and ensure "the various provisions are harmonized."  *State Farm Fire & Cas. Co. v. Nationwide Mut. Ins. Co*., 596 F. Supp. 2d 940, 946 (E.D. Va. 2009); *Schuiling v. Harris*, 747 Va. 187, 193 (2013).  For example, in the event a term is undefined, Virginia law permits courts to "consider[] its meaning in the context of the polic[y] as a whole."  *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co*., 566 F.3d 150, 158 (4th Cir. 2009); *Midlothian Enters., Inc. v. Owners Ins. Co*., 439 F. Supp. 3d 737, 741 (E.D. Va. 2020) (observing that courts read "a word in the context of a sentence, a sentence in the context of a paragraph, and a paragraph in the context of the entire agreement.").

In applying the Fourth Circuit's interpretive approach in *CACI Int'l*, courts are obligated to consider the context of the contract in question in order to assess the plain meaning of the text. *See, e.g.*, *Schwartz & Schwartz of Va., LLC v. Certain Underwriters at Lloyd's*, 677 F. Supp. 2d 890, 905 (W.D. Va. 2009) ("[T]he ordinary and accepted meaning of an undefined term cannot be divined in isolation, but instead is informed by the surrounding context of the insurance policy." (citing *CACI Int'l, Inc*., 566 F.3d at 158)).  Here, the terms of interest raised by Plaintiffs in the definition of "pollution condition" are "irritant, contaminant, or pollutant."

Plaintiffs argue that COVID-19 constitutes an "irritant, contaminant, or pollutant" based on standalone dictionary definitions of each term in a vacuum.  Therefore, they argue, they meet their initial burden of bringing their claim within the confines of the Policy's coverage.  Citing *TRAVCO*, Plaintiffs assert that the "Court was requested to limit the definition of pollution to traditional pollutants but rejected that argument expressly."  Dkt. 47 at 26.

But *TRAVCO* does not support Plaintiffs' reading of "pollution condition" because it deals with pollution *exclusions*—clauses in some insurance contracts meant to clearly identify liability for which the insurer is not responsible—rather than affirmative pollution coverage.  Here, no pollution exclusions exist in the Policy.  *See generally* Dkt. 1-2 at 32-48; *see also* Dkt. 47 at 14. *TRAVCO* teaches that exclusions are sometimes meant to canvas non-traditional forms of environmental liability, which by implication, may be useful in evaluating the extent of affirmative liability coverage clauses.  715 F. Supp. 2d at 715-16 (discussing how Virginia courts appear to take the view that unambiguous pollution exclusions may encompass non-traditional forms of environmental pollution); *See also Colonial Oil Indus. Inc. v. Indian Harbor Ins. Co.*, 528 F. App'x 71, 74-75 (2d Cir. 2013) (relying on cases interpreting pollution exclusion clauses to determine that a pollution liability policy intended to provide coverage for "environmental harm resulting from the disposal or containment of hazardous waste").  But because the *TRAVCO* Court confronted a pollutant far different from COVID-19—a sulfur gas emitted from defective Chinese drywall, not a virus spread exclusively by humans—and the policy at issue included a pollution exclusion, *TRAVCO* is unpersuasive for purposes of analyzing *this* Policy.

Even if this Court applied the same rationale in *TRAVCO* regarding pollution exclusions to affirmative pollution coverage in this case, Plaintiff's position remains untenable.  *TRAVCO* relies on this Court's insurer-friendly decision in *Firemen's Ins. Co. of Washington, D.C. v. Kline & Son*

*Cement Repair, Inc.*, to find that a pollution exclusion clause covered all forms of pollutants, be they traditional or non-traditional. 474 F. Supp. 2d 779, 797 (E.D. Va. 2007). The Court broadly interpreted the pollution exclusion in *Firemen's Ins. Co.* because "[n]owhere in the Policy is there any reference to the word 'environment,' 'environmental,' 'industrial,' or any other limiting language suggesting the pollution exclusion is not equally applicable to both 'traditional' and indoor pollution scenarios." *Id.* (extending the pollution exclusion analysis for traditional pollutants in the Virginia Supreme Court's decision in *Chesapeake v. States Self-Insurers Risk Retention Gr., Inc.*, 271 Va. 574 (2006) to non-traditional pollutants). Applying the logic of policy exclusions in *TRAVCO* and *Firemen's Ins. Co.* to the affirmative pollution coverage in the present Policy advances the view that "pollution condition" does not extend to non-traditional pollutants that might include COVID-19. Unlike the policy in *Firemen's Ins. Co.*, the present Policy imputes environmental concerns to the coverage clause at issue by referencing "environmental law," and "environmental professional." Each of these terms relates back to the  definition of "pollution condition." More telling is the fact that the Policy already creates a separate category for "indoor environmental conditions," effectively signposting that "pollution condition" was meant to solely encapsulate traditional environmental pollutants rather than non-traditional indoor pollutants. As described further below, each of these facts takes the wind out of the sails in Plaintiff's assertion that a genuine issue of material fact exists as to whether "pollution condition" should be read to cover COVID-19.

Reading the Policy as a whole, it is evident that the term "pollution condition" is confined to environmental pollution. A communicable disease caused by a virus simply does not fall within the ambit of language used to define and effect the purpose of the "pollution condition" term in the Policy. While Plaintiffs raise the fact that the very same defendant failed to challenge that bird

flu constituted a "pollution condition" in a 2017 case brought under New York law, the defendant never affirmatively admitted to bird flu falling within the purview of the Policy.  Dkt. 47 at 2 n.3 (citing *Rembrandt Enterprises, Inc. v. Illinois Union Ins. Co.*, 269 F. Supp. 3d 905, 908 (D. Minn. 2017) ("Nor does [Defendant] dispute that Rembrandt's farms were impacted by a 'pollution condition.'")).  Moreover, not only did the *Rembrandt* Court avoid any analysis or findings as to whether a "pollution condition" actually includes bird flu, such extrinsic evidence may only be considered if the policy is ambiguous.  Because this Court finds the Policy's language related to "pollution condition" to be unambiguous, the Court need not consider extrinsic evidence.  *World-Wide Rts. Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992).[1]  Thus, *Rembrandt* is uninstructive in this case.

When reading the relevant Policy provisions together, it cannot be reasonably disputed that the definition of "pollution conditions" applies only to traditional environmental liability.  The Policy defines "remediation costs" as expenses related to discovering and limiting the negative impact of "pollution conditions" "to the extent required by 'environmental law.'"  "Environmental

---

[1] Plaintiffs provide in their Reply to Defendant's Opposition Brief, Dkt. 59 at 10, a litany of cases extending pollution exclusions to matters beyond traditional environmental pollution. However, for the reasons indicated earlier in this opinion, this Court does not find such cases controlling or persuasive due to the distinctly different nature and purpose of pollution exclusions as compared to affirmative pollution coverage in the context of insurance policies.  Furthermore, none of those cases interpreted policies under which a policyholder sought coverage for losses from a virus like COVID-19.  Moreover, Plaintiffs rely on the expert report of Dr. Hung K. Cheung, whereby Dr. Cheung concludes that COVID-19 constitutes a "pollution condition."  Dkt. 49-2 at 150.  Such evidence proves unavailing in light of this Court's finding that the definition is unambiguous.  Even if this Court considered such evidence, Dr. Cheung's conclusion relies on how the U.S. Environmental Protection Agency defines viruses "in the Indoor environment as biological pollutants."  Given this Policy goes to great lengths to carve out a separate category of liability coverage for "indoor environmental condition" and mentions neither viruses generally nor any specific virus strain, which poses a threat indoors and not outdoors as Plaintiffs' experts note, Dr. Cheung's report buttresses this Court's view that the Policy is abundantly clear: it was not purposed to cover liability arising from virus outbreaks like COVID-19.

law" is defined to include those laws subject to "voluntary cleanup or risk-based corrective action guidance, or the direction of an 'environmental professional' acting pursuant to the authority provided by any such Laws, along with any governmental, judicial or administrative order or directive, governing the liability or responsibilities of the 'insured' with respect to a 'pollution condition.'" Moreover, the Policy separately defines the term "indoor environmental condition" to describe specifically "[t]he presence of 'fungi' in a building or structure . . . or [t]he discharge, dispersal, release, escape, migration or seepage of *legionella pneumophila* . . . provided that such fungi or *legionella pneumophila* are not naturally occurring in the environment . . . ." Given the Policy's specific references to fungi and a specific strain of bacteria, this Court has every reason to find that leaving out the term "virus" was purposeful.

That the writers of the Policy bifurcated an "indoor environmental condition" from "pollution conditions" indicates that "pollution condition" is not to be read liberally. Indeed, courts have addressed other policies that contain the term "virus" within the definition of "indoor environmental condition" and reasoned that, in those cases, the definition of "pollution condition" cannot be understood to cover viruses. *See Essentia Health v. ACE Am. Ins. Co.*, __ F. Supp. 3d __, 2021 WL 2117241, at *6 (D. Minn. May 25, 2021). Without question, the Policy couches liability related to pollution with references solely to environmental concerns and not to risks related to human transmissible viruses.

Already there have been a number of district courts that have considered whether COVID-19 can be reasonably considered a pollutant for purposes of insurance policy coverage. And each of those courts has decidedly ruled that no reasonable plain reading of "pollutant" or "pollution" captures COVID-19 where no explicit language exists to include viruses. *See id.* at **4-7 (finding substantially similar "pollution condition" to not encompass COVID-19 liability claims);

15

*Gumberg as Tr. of Coral Ridge Shopping Ctr. Tr. v. Great Am. E & S Ins. Co.*, No. 20-23541-CIV, 2021 WL 2037861, at *3 (S.D. Fla. May 21, 2021) (finding that COVID-19 does not constitute a pollutant under a similar insurance policy); *Circus LV, LP v. AIG Specialty Ins. Co.*, 525 F. Supp. 3d 1269, 1278 (D. Nev. 2021) (finding that COVID-19 did fall within the pollution insurance policy coverage but noting that the decision turned on the phrase "including, but not limited to, bacteria, virus, or hazardous substances" contained in the policy, which distinguished environmental liabilities from dangers to human health); *London Bridge Resort LLC v. Illinois Union Ins. Co.*, 505 F. Supp. 3d 956, 959 (D. Ariz. 2021) (reading the policy of this same defendant with same "pollution condition" definition to apply only to traditional environmental pollution and holding that COVID-19, or any virus outbreak for that matter, did not fall within the four corners of the coverage).  This Court finds nothing in the record that would suggest the Policy's language should be read differently.

### B.   Recovery for Covered Loss Under the Policy

Even if the definition of "pollution condition" could reasonably be read to include a virus outbreak like COVID-19, Plaintiffs would still need to make the case that a reasonable factfinder could find a genuine dispute as to the material fact that losses incurred by Plaintiffs were "directly attributable" to COVID-19 and triggered any of the coverages under the Policy.

To level set with the relevant Policy definitions, Plaintiffs' claim for compensation under Coverage A depends on finding "Loss" either (1) in the form of "first-party remediation costs" or (2) "business interruption loss" stemming from the occurrence of the "'pollution condition' on, at[,] under or migrating from a 'covered location.'" Dkt. 1-2 at 32, 38.  Plaintiffs claim the majority of their losses are due to "business interruption" caused by the "necessary partial . . . suspension of the 'insured's' operations at a 'covered location' for a period of time, which is directly

attributable to a 'pollution condition.'"  Dkt. 47 at 18.  The phrase "directly attributable" is understood in the insurance context to require proximate rather than but-for causation.  *See Essentia Health*, 2021 WL 2117241 at *7 n.10; 7 Steven Plitt et al., *Couch on Insurance* 101:48, 51 (3d ed. Dec. 2021) ("In other words, notwithstanding the fact that the initial event would have otherwise been considered the proximate cause, the intervening event creating the break in the original chain of events is considered the proximate cause for purposes of determining coverage under the policy.").  In simple terms, the cause of Plaintiffs' remediation costs and business interruption losses must be the presence of COVID-19 at a "covered location" rather than some intervening cause, such as the acts of third parties.

"Business interruption loss" is defined in the Policy to include both the loss of "business income" and "extra expense."  The Policy defines "business income" as "net profit or loss . . . that would have been realized had there been no 'business interruption'" Dkt. 1-2 at 35.  The Policy defines "extra expense" as:

> costs incurred by the "insured" due to a "pollution condition" or "indoor environmental condition" that are necessary to avoid or mitigate any "business interruption".  Such costs must be incurred to actually minimize the amount of foregone "business income" that would otherwise be covered pursuant to this Policy.

*Id.* at 37.  Plaintiffs claim that "the Remediation Costs and Extra Expenses have been identified and measured together."  Dkt. 54 at 32.  Here, Plaintiffs provide ample evidence of the costs they consider directly attributable to a "pollution condition," as well as testimony from various medical experts as to the likelihood that COVID-19 shed from employees who had tested positive onto the premises of the covered locations.  But Plaintiffs have not presented a genuine dispute as to the material fact that such discovery was "directly attributable" to the partial suspension of business operations at each of the covered locations.  Nothing in Plaintiffs' Complaint or supporting exhibits

suggests that their businesses would have suspended operations were it not forced to do so by the Commonwealth of Virginia.

In Plaintiffs' initial claim letter to Defendant on March 20, 2020, they noted:

As a result of a Pollution Condition, triggered by a hazardous condition created by . . . COVID-19, and associated actions by civil authorities . . . [T]here will be a substantial impact on business and a claim for business interruption is being made and will be compiled on [*sic*] the Pollution Condition has been remediated to the point at which the insureds normal operations can reasonably be restored.

Dkt. 1-2 at 323. Plaintiffs did not document a positive COVID-19 employee diagnosis at any of the covered locations until June 12, 2020. Dkt. 47-5 at 2.

Despite Plaintiffs' extensive documentation of its employees' positive COVID-19 diagnoses at each of the "covered locations," Plaintiffs' claim for coverage emanates directly from the suspension of its business and not the infection of its employees. Any alleged costs were associated with remediating the potential presence of COVID-19 at the "covered locations." However, the suspension of Plaintiffs' businesses is not directly attributable to COVID-19; rather, the restrictions imposed by the Commonwealth of Virginia on the operations of Plaintiffs' businesses caused their business interruption.

In *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co*., 506 F. Supp. 3d 360, 377 (E.D. Va. 2020), this Court applied the same reasoning to a property damage insurance claim associated with economic fallout from COVID-19.[2] In that case, the disputed policy was much broader than Defendant's Policy by providing coverage for "extra expenses and loss of income

---

[2] While Plaintiffs argue that policies requiring "direct physical loss" are inapposite to the case at bar, we need not adhere only to case law with substantially similar coverage policies. Dkt. 59 at 20. The Court finds the same reasoning in those cases instructive here given the need to identify the causal mechanism between general loss claimed under the Policy (*i.e.* the business interruption loss and remediation costs) and the presence of restrictions imposed by a civil authority in connection with the COVID-19 pandemic. Moreover, Plaintiffs rely on at least one case involving a direct physical loss provision in their opening brief. Dkt. 47 at 16 (citing *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794 (W.D. Mo. 2020)).

caused by 'action of a civil authority that prohibits access to the described premises.'" *Id.* at 376. Even with such coverage spelled out in the policy, the Court ruled against coverage because "Plaintiff had not shown a causal link between any physically damaged or dangerous surrounding properties . . . a civil authority prohibiting Plaintiff's [*sic*] from accessing or using their property." *Id.* at 377. Said differently, the civil authority directives were made due to the overarching threat of COVID-19 to communities throughout Virginia and not because of any specific negative impact experienced by the insured with respect to the virus' physical presence at the insured's covered location. *See also Skillets, LLC v. Colony Ins. Co.*, 524 F. Supp. 3d 484, 491 (E.D. Va. 2021) (first describing insured's claims as "several conclusory, and largely speculative, allegations: that COVID-19 was 'no doubt present'" at the covered location and that "[p]eople came into [the restaurant] and sent COVID-19 infested droplets flying throughout the property" as evidenced by the positive tests of employees on site, and then finding such claims unpersuasive because they are "inseparable from the closure orders"). The same reasoning applies here. Therefore, even if COVID-19 qualified as a "pollution condition" under the Policy, there exists no dispute as to any material fact that the losses experienced by Plaintiffs derive single-handedly from the actions of civil authorities and not from the discovery of a "pollution condition" at any of the covered locations.

Plaintiffs have not pleaded any facts demonstrating that the presence of COVID-19 at any of the "covered locations" directly contributed to the suspension of Plaintiffs' business activity. In fact, in Plaintiffs' initial claim letter, they expressly acknowledged that COVID-19 did not exist at their "covered locations" and, by implication, they could not discover a "pollution condition" whereby Plaintiffs could not demonstrate its physical existence at any of its "covered locations" at the time the claim was filed with the adjuster. And in Plaintiffs' April 17, 2020 response to

Defendant's coverage denial letter, Plaintiffs provided a detailed account of the events contributing to their loss—none of which related to the physical presence of COVID-19 at any of the covered locations.  Dkt. 1-2 at 333-34.  Had Plaintiffs sent a claim letter to Defendant following the positive diagnoses of its employees and made a case for a business interruption as a result of the diagnoses and not the directives of a civil authority, a triable issue of fact could conceivably be presented.  But accounting for the facts presented in the case, argument about whether the virus existed beyond its human vectors working on site at the "covered locations" becomes beside the point.

Plaintiffs have failed to show that income loss directly resulting from the positive COVID-19 diagnoses at one or more of the "covered locations" represents a genuine issue of material fact that a reasonable factfinder could resolve in their favor.  Instead, the facts presented suggest without question that the losses Plaintiffs suffered were directly attributable to the various declarations and directives by the Governor of Virginia, the cancellation of events that would have generated revenue for Plaintiffs' businesses, and the dramatic decrease in travel at the onset of the COVID-19 outbreak and continuing through the period of the claim.

Not only are Plaintiffs unable to bridge the causal gap in proving business operational losses under the Policy, they also fail to establish coverage for their claimed remediation costs.  The Policy requires that losses "shall extend from the date that the operations are necessarily suspended" to the point at which such "pollution condition" "has been remediated" such that "'insured's' normal operations could be reasonably restored."  In order to demonstrate "first-party remediation costs," there must have existed "reasonable necessary 'remediation costs'" that were "incurred . . . from the discovery of a 'pollution condition.'"  *Id.* at 37.  "Remediation costs" are those "expenses incurred to investigate, quantify, monitor, remove, dispose, treat, neutralize, or immobilize 'pollution conditions.'"  *Id.* at 40.  Similarly, the other category of loss claimed by

Plaintiffs under Coverage A—"business interruption loss"—includes "extra expense," which Plaintiffs join with the category of "remediation costs."[3]   Put simply, both claims made by Plaintiffs pursuant to loss under Coverage A require evidence of remediation directly tied to mitigating and preventing future loss.

Here, Plaintiffs allege they have incurred $252,344.66 in remediation costs resulting from their "discovery of a 'pollution condition.'"  Dkt. 54 at 31.  These costs related to the purchase of "sanitizers and cleaners . . . thermometers, masks, social distancing, the use of signage and paper menus."  *Id.*  Yet the restoration of insureds' normal operations depended entirely on the orders of civil authorities as well as the general sentiments of Plaintiffs' patrons.  For example, the specific remediation measures taken by Plaintiffs, meant to disinfect and prevent future occurrence of the virus at any of the "covered locations," in no way impacted the restoration of Plaintiffs' normal operations.  Neither did such measures directly influence the Virginia Governor and State Health Commissioner's decision to relieve certain operational restrictions on businesses across the Virginia, cause events at nearby locations to be held when they otherwise would not have been, or increase the rate of travel through the areas encompassing Plaintiffs' covered locations.

Ultimately, the negative impact caused by positive employee COVID-19 tests on Plaintiffs' business operations is that such employees are unable to work on site at the "covered locations." Remediation measures in response to that negative impact might include hiring new employees on a full-time or temporary basis who could take the place of those employees unable to work while in quarantine.  But such loss-mitigating measures do not fall within the definition of "remediation

---

[3] The Policy defines "Extra expense" as:

costs incurred by the 'insured' due to a 'pollution condition' or 'indoor environmental condition' that are necessary to avoid or mitigate any 'business interruption'.  Such costs must be incurred to actually minimize the amount of foregone 'business income' that would otherwise be covered pursuant to this Policy.

costs" or "extra expense" because those measures do nothing to curtail the spread of the virus at Plaintiffs' "covered locations."

Plaintiffs also raise claims under Coverage B of the Policy, which requires a showing of "emergency response costs" within seven days of discovering a "pollution condition." Plaintiffs, with no certain precision as to timing, assert "the presence of the [COVID-19] virus being disbursed into the atmosphere and deposited on surfaces at each covered location triggers Coverage B." Dkt. 47 at 18. The Policy defined "emergency response costs" in relevant part to involve remediation measures arising out of a "pollution condition" "on, at, under or migrating from a 'covered location.'" Dkt. 1-2 at 36. This Court sees no factual controversy concerning Plaintiffs having notified Defendant of their discovery of a "pollution condition" in their initial March 20, 2020 letter. But at the time Plaintiffs claim they discovered this pollution condition, Plaintiffs proffer no evidence to suggest COVID-19 physically existed at any of the covered locations.[4] Therefore, no remediation costs could be claimed under Coverage B given that seven days had run out by March 27, 2020—months prior to the first catalogued positive COVID-19 test by one of Plaintiffs' employees at one of the "covered locations." No reasonable basis exists to find a genuine dispute of material fact as to the applicability of Coverage B to Plaintiffs' claims.

Lastly, Plaintiffs insinuate in their April 17, 2020 letter to Defendant that they are due recovery for loss of rental income by way of their Supplemental Coverage (Endorsement 9). "Loss of rental income" is defined as "the total, reasonable anticipated rental fees owed to the 'insured' from tenant occupancy due to the 'suspension' of a rented 'covered location.'" Dkt. 1-2 at 62.

---

[4] In their claim letters to Defendant, Plaintiffs make continued reference to having discovered the "pollution condition" without any confirmation that the "pollution condition" was "on, at[,] under or migrating from a 'covered location.'" Instead, Plaintiffs' claim appears to read "migrating *to* a 'covered location'" into the Policy's language.

"Suspension" occurs when "part of, or all of, a rented 'covered location' is rendered untenantable . . . due to a 'pollution condition' on, at or under . . . such 'covered location,' which results in first-party 'remediation costs.'" *Id.*

However, for the same reasons outlined above, loss of rental income at any of Plaintiffs' "covered locations" derives directly from external factors, including civil authority directives, cancellations of events that might otherwise drive rental income for Plaintiffs, and the general dysphoria of the COVID-19 pandemic, none of which are specific to the discovery of COVID-19 at any of Plaintiffs' properties. Any "covered location" Plaintiffs deem "untenantable" is due to governmental mandates and the associated statewide, national, and international reaction to the pandemic, not any findings that COVID-19 exists at a "covered location" or that the virus amounts to the discovery of a "pollution condition" causing tenants to halt their payments or ability to operate within a "covered location."

For these reasons, even if COVID-19 were to fit within the contours of the Policy's "pollution condition" definition, Plaintiffs have failed to present a genuine dispute of material fact regarding the ability of claimed losses and remediation expenses to satisfy the requirements of each of the three applicable coverages.

### C. Plaintiffs' Bad Faith Claim

Because Plaintiffs have not shown a basis for recovery under the Policy, there are no grounds for a bad faith breach of contract claim against Defendant. *U.S. Airways, Inc. v. Commonwealth Ins. Co.*, 64 Va. Cir. 408, 2004 WL 1094684, at *9 (Va. Cir. Ct. May 14, 2004) ("A judgment against the insurer acts as a condition precedent to any claim of bad faith in Virginia[.]")). And even if Plaintiffs had shown a basis for recovery under the Policy, they have not demonstrated a reasonable basis for finding Defendant acted in bad faith when denying

coverage to Plaintiff.  Indeed, Plaintiffs' reliance on *Levine v. Selective Insurance Co. of America*, 250 Va. 282 (1995) is inapposite to this case.  *Levine* turned on an insurance provider having already ceded that at least some coverage was owed to the insured making the claim and the court found bad faith on the basis of the insurer not having paid out the accepted claim in a timely manner.  *Id.* at 284.  On the contrary, at no point did Defendant in this case concede that any coverage was due to Plaintiffs under the present Policy.  Instead, Defendant flatly denied Plaintiffs' claim in its response letter, dated April 9, 2020 because the claim "d[id] not involve a 'pollution condition or 'an indoor environmental condition'," and as a result, "coverage for 'business interruption' is not triggered."  Dkt. 47-9 at 4.

Within the insurance context, Virginia courts ask whether an insurer's denial of coverage amounts to being reasonably debatable.  *CUNA Mut. Ins. Soc'y v. Norman*, 237 Va. 33, 39 (1989). While Plaintiffs argue that Defendant provided merely a "tautological statement that COVID claims are not pollution conditions" in denying Plaintiffs' initial claim letter, Defendant demonstrated the insurer undertook a reasonable investigation into the claim prior to providing its response letter denying coverage three weeks later.  Dkt. 54 at 35.  During that three-week period, Defendant requested "any and all documentation" related to "business interruption costs related to COVID-19."  Dkt. 49-2 at 105-06.  Aside from referring the claims adjuster to the Governor's order and other general information regarding the impact of COVID-19 on Virginia, Plaintiffs failed to provide any semblance of documentation demonstrating the presence of COVID-19 on their properties at any time before or after Defendant issued the denial of coverage letter.  This fact alone assures this Court that Defendant's denial of coverage is, at worst, reasonably debatable. Therefore, no grounds exist to assert a bad faith claim as a matter of law.

## IV.   CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the Defendant's Motion for Summary Judgment (Dkt. 48) is GRANTED; and it is

FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Dkt. 46) is DENIED.

The Clerk is directed to enter judgment for Defendant pursuant to Federal Rule of Civil Procedure 58 and close this civil action.

It is SO ORDERED.

Alexandria, Virginia
January 5, 2022

/s/

Rossie D. Alston, Jr.
United States District Judge